IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 25-CR- |
| ) | 18 U.S.C. § 1343 |
| RAEKWON T. RANDLE, ) | |
| ) | |
| Defendant. ) | |

INFORMATION

The United States Attorney Charges:

COUNTS ONE-THREE
(Wire Fraud)

At all times material:

1. Defendant, RAEKWON T. RANDLE (RANDLE), was a resident of Springfield, Illinois within the Central District of Illinois.

The Small Business Administration and the CARES Act

2. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by empowering the establishment and viability of small businesses and by stimulating the economic recovery of communities after disasters.

3. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders that had government-backed guarantees. The SBA also provided direct loans.

4. In or around March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted to provide emergency financial assistance to the millions of Americans suffering adverse economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for expansion of others, including programs created and/or administered by the SBA.

### The Paycheck Protection Program

5. One source of relief provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). PPP loan proceeds were required to be used by the business to pay certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities.

6. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the applicant business (through its authorized representative) to acknowledge

the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. Such certifications required the applicant to affirm that "The [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments," and that the "loan proceeds will be used only for business-related purposes as specified in the loan application" and consistent with the PPP rules. The authorized representative of the applicant was also required to certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in material respects," and "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

7. In the PPP loan application, the applicant was required to state, among other things, the business's: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses, including federal tax filings and bank account records.

8. A small business's PPP loan application would be received and processed by a participating lender approved by the SBA. If a PPP loan

application was approved, the participating lender would fund the PPP loan using its own monies, which were guaranteed by the SBA. For each funded application lenders received a processing fee from the SBA in a percentage of the loan or an amount not less than $2,500.00.

9. Womply, a Deleware corporation, was a software-as-a-service (SaaS) provider to small businesses acting as both a referral agent sending businesses to lenders but also a technology service provider. Womply created an application to process PPP loan applications called "PPP Fast Lane." The software was internet based and users would interact with Womply's system over the internet. Most, if not all, phases of the loan process were completed in Fast Lane, including filling out the application and signing of the loan documents.

10. Harvest Small Business Finance, LLC ("Harvest") was a financial institution, headquartered in Laguna Hills, CA. Harvest was licensed by the Small Business Administration ("SBA") and authorized to directly originate, fund, and service SBA loans, with backing by the SBA guaranty.

11. The Bancorp, Inc., headquartered in Wilmington, Delaware, was a payment services provider and specialized lender within the U.S. through its subsidiary, The Bancorp Bank, N.A. (headquartered in Sioux

Falls, South Dakota). The Bancorp Bank, N.A., was insured by the Federal Deposit Insurance Corporation.

12. Varo Bank, based in Draper, Utah, was a financial institution insured by the Federal Deposit Insurance Corporation (FDIC).

13. Benworth Capital (Benworth), was an approved SBA participating lender based in Florida.

## The Scheme to Defraud

14. Beginning in or about April 2021, and continuing until at least June 2021, in the Central District of Illinois, and elsewhere, the defendant,

RAEKWON T. RANDLE,

knowingly devised and participated with others in a scheme to defraud the SBA, Harvest, and their related entities and others, to obtain money by means of materially false and fraudulent pretenses, representations, and promises, all affecting financial institutions as defined under 18 U.S.C. § 20. It was a part of the scheme and artifice to defraud that:

15. As part of the scheme, Defendant RANDLE recruited and assisted others to apply for PPP loans using fraudulent tax documents, which falsely represented that the borrowers operated a profitable beauty salon, hair stylist, auto repair, and other business that the borrowers did not own and operate. Approximately $208,330 of fraudulent loans were

funded as a result of this scheme by RANDLE. Neither RANDLE nor these individuals were lawfully entitled to these proceeds.

16. As part of the scheme, Defendant RANDLE received a fee or kickback of approximately $2,000 to his Varo bank account for each borrower he recruited or assisted. RANDLE received in total approximately $16,000.

17. One of these people, Individual A obtained $20,833 from Benworth Capital for a PPP loan for a beauty/ cosmetology business they did not have. RANDLE assisted Individual A in applying for the loan. RANDLE was subsequently paid $2,000 after that loan was funded.

18. On or around April 14, 2021, and again on April 16, 2021, RANDLE completed and submitted PPP loan applications to Harvest that were subsequently approved and funded. In order to qualify for the loans, RANDLE submitted materially false information, stating he was the 100% owner of a sole proprietorship business engaged in business consulting that the business was started in 2019, that it had gross profits totaling $106,600.00 for the year 2019, that the net profit was $94,250 and $115,700 respectively, and that the business had one employee. Submitted with the loan applications were false and fraudulent supporting documentation, including fraudulent tax documents. RANDLE falsely certified and caused to be certified that all loan proceeds would be used

only for business-related purposes. The applications were submitted to Harvest using an internet-based platform, Womply.

19. In reliance on RANDLE's materially false and fraudulent statements and his concealment of material facts, Harvest approved and funded the PPP Loan Applications, and thereafter on April 26, 2021, transferred approximately $20,833.00 in proceeds by interstate wire into a Bankcorp bank account that RANDLE controlled and again on again on May 26, 2021 transferred approximately $20,833.00 in proceeds into a Bankcorp bank account that RANDLE controlled, for a total of approximately $41,666.00.

20. RANDLE used the fraudulently obtained PPP loan proceeds for his own personal benefit, including for expenses prohibited under the requirements of the PPP program.

21. In reliance on RANDLE's materially false and fraudulent statements and his concealment of material facts, Individual A obtained a $20,833 PPP loan from Benworth Capital for a beauty/ cosmetology business Individual A did not have. RANDLE assisted Individual A in applying for the loan. Individual A used the PPP loan proceeds for Individual A's personal benefit, including for expenses prohibited under the requirements of the program. After receipt of that PPP loan,

Individual A then transferred $2,000 to RANDLE via his Varo bank account.

## Executions of the Scheme

22. On or about the dates listed below, for each count, and for the purpose of executing the above-described scheme to defraud and to obtain money and property, the defendant,

RAEKWON T. RANDLE,

caused to be transmitted the following interstate wire communications:

| COUNTS | DATE | NATURE OF TRANSMISSION |
|---|---|---|
| 1 | April 14, 2021 | Loan application from RANDLE to Harvest of California using Womply's "Fast Lane" software program. |
| 2 | May 13, 2021 | Transfer of $2,000 from Individual A to RANDLE's Varo back account |
| 3 | June 1, 2021 | Harvest transfer of $20,833.00 into RANDLE'S bank account at Bankcorp Bank |

All in violation of Title 18, United State Code, Section 1343.

## **COUNT FOUR**
## **(Wire Fraud)**

Introduction

At all times material:

1.      Defendant, RAEKWON T. RANDLE (RANDLE), was a resident of Springfield, Illinois within the Central District of Illinois.

2.      Defendant maintained control of a bank account in his name at Bankcorp Bank, a financial institution insured by the Federal Deposit Insurance Corporation (FDIC), based in Sioux Falls, South Dakota.

3.      Defendant maintained control of a bank account in his name at Varo Bank, a financial institution insured by the Federal Deposit Insurance Corporation (FDIC), based in Draper, Utah.

4.      Unemployment Insurance (UI) was a joint state and federal program that provided monetary benefits to eligible beneficiaries. UI payments were intended to provide temporary financial assistance to lawful workers who were unemployed through no fault of their own. Beginning in or around March 2020, in response to the COVID-19 pandemic, several federal programs expanded UI eligibility and increased UI benefits, including the Pandemic Unemployment Assistance Program (PUA), Federal Pandemic Unemployment Compensation (FPUC), and the Lost Wages Assistance Program (LWAP).

5. In the State of Indiana, the Indiana Department of Workforce Development (IN-DWD) based in Indianapolis, Indiana, administered the UI program. Those seeking UI benefits submitted online applications. Applicants had to answer specific questions to establish eligibility to receive UI benefits, including their name, Social Security Number (SSN), and mailing address, among other things. Applicants also had to self-certify that they met a COVID-19-related reason for being unemployed, partially employed, or unable to work. The IN-DWD relied upon the information in the application to determine UI benefits eligibility. Once an application was approved, one of the ways IN-DWD provided benefits was by direct deposit to the applicant's bank account.

6. In the State of Nevada, the Department of Employment, Training & Rehabilitation (NV-DETR) with offices in Carson City and Las Vegas, Nevada, administered the UI program. Those seeking UI benefits submitted online applications. Applicants had to answer specific questions to establish eligibility to receive UI benefits, including their name, Social Security Number (SSN), and mailing address, among other things. Applicants also had to self-certify that they met a COVID-19-related reason for being unemployed, partially employed, or unable to work. The NV-DETR relied upon the information in the application to determine UI benefits eligibility. Once an application was approved, one of the ways NV-

DETR provided benefits was by direct deposit to the applicant's bank account.

7.     In the State of Illinois, the Illinois Department of Economic Security (IDES) administered the UI program. Those seeking UI benefits submitted online applications. Applicants had to answer specific questions to establish eligibility to receive UI benefits, including their name, Social Security Number (SSN), and mailing address, among other things. Applicants also had to self-certify that they met a COVID-19-related reason for being unemployed, partially employed, or unable to work. The IDES relied upon the information in the application to determine UI benefits eligibility. Once an application was approved, one of the ways IDES provided benefits was by direct deposit to the applicant's bank account.

The Scheme to Defraud

8.     Beginning in or about March 2020, and continuing until at least June 2021, in the Central District of Illinois, and elsewhere, the defendant,

RAEKWON T. RANDLE,

knowingly devised and participated with others in a scheme to defraud the SBA, Harvest, and their related entities and others, to obtain

money by means of materially false and fraudulent pretenses, representations, and promises, all affecting financial institutions as defined under 18 U.S.C. § 20. It was a part of the scheme and artifice to defraud that:

10. On or about November 6, 2020, RANDLE submitted a false and fraudulent application using IN-DWD online portal for unemployment insurance. The application used the same address and phone number as the IDES claim and a separate claim to NV-DETR. RANDLE falsely claimed he was employed by a business based in Plainfield, Indiana between March 14, 2020 and November 7, 2020, when in fact, RANDLE had never worked for the Indiana based business. RANDLE further falsely claimed in connection with this application that he had not received unemployment from any other state and that he lived in Indiana.

11. The application included a false certification that all information contained in the application was true and complete. The certification required the applicant to acknowledge that a false statement would subject the person to criminal penalties.

12. As the result of his false and fraudulent application, RANDLE received $15,415 in total via direct deposits to his PNC Bank account from IN-DWD.

13. On or about the date listed below and for the purpose of executing the above-described scheme to defraud and to obtain money and property, RANDLE transmitted and caused to be transmitted the following interstate wire communications:

| COUNT | DATE | NATURE OF COMMUNICATION |
| --- | --- | --- |
| 4 | November 6, 2020 | Unemployment insurance application from RANDLE in Illinois to the State of Indiana. |

s/ Sarah E Seberger                for
GREGORY M. GILMORE
ACTING UNITED STATES ATTORNEY
SES